**BAXLEY–DeLAMAR MONUMENTS, INC., Appellant,**

**v.**

**AMERICAN CEMETERY ASSOCIATION; Arkansas Cemetery Association; Edgewood Memorial Park, Inc.; Griffin Leggett, Inc. a/k/a Forest Hills Memorial Park Inc., d/b/a Rest Hills Memorial Park; Pinecrest Memorial Park & Garden Mausoleum; Sun Realty Co. a/k/a Forest Hills Memorial Park, Appellees.**

**No. 90–1393.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 7, 1991.

Decided July 9, 1991.

---

Edward Ray Fechtel, Eugene, Or., for appellant.

Stephen W. Armstrong, Philadelphia, Pa., argued, for appellee; Lewis H. Mathis, Morgan E. Welch, and Richard T. Donovan, Little Rock, Ark. and Stephen W. Armstrong and David H. Marion, Philadelphia, Pa., on the brief.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and SACHS,* District Judge.

JOHN R. GIBSON, Circuit Judge.

Once again we entertain an appeal in this antitrust case, which concerns an alleged practice of tying sales of gravestones and cemetery lots. In *Baxley–DeLamar Monuments, Inc. v. American Cemetery Ass'n*, 843 F.2d 1154 (8th Cir.1988) (*Baxley I*), we held that Baxley, a gravestone dealer, had adequately pleaded violations of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2 (1988 & West Supp.1990)) against the defendant cemeteries and trade organizations.[1] The case proceeded to a jury trial, and there was a verdict for the defendants. Baxley appeals, arguing that the district court[2] should have submitted its claims of individual tying violations to the jury in addition to the claim of tying conspiracy that the court actually submitted. Baxley also argues that the dis-

1. The defendants are the American Cemetery Association; Arkansas Cemetery Association; Edgewood Memorial Park, Inc.; Pinecrest Memorial Park and Garden Mausoleum; Griffin– Leggett, Inc. d/b/a Forest Hills Memorial Park and d/b/a Rest Hills Memorial Park, Inc.; and Sun Realty Co. d/b/a Forest Hills Memorial Park.

2. The Honorable Stephen M. Reasoner, United States District Judge for the Eastern District of Arkansas.

trict court erred in making several evidentiary rulings, in not giving a requested instruction, and in not permitting Baxley to file a supplemental complaint. We affirm the district court's judgment.

Baxley is an independent gravestone dealer doing business primarily in Little Rock and Benton, Arkansas (in Pulaski and Saline Counties, respectively). The cemetery defendants are past or present owners of four perpetual care cemeteries in Pulaski and Saline Counties, and the cemetery association defendants are trade groups to which various of the defendant cemeteries belong. Baxley alleged at trial that the defendants conspired to set obstacles that would prevent outside businesses from installing grave memorials [3] in the defendants' cemeteries and thereby force the lot-owners in those cemeteries to hire the cemeteries to install the memorials and discourage customers from buying memorials from Baxley at all. The nature of the alleged obstacles varied over the relevant time period, 1980–86, as the defendants responded to various court decisions, but included outright prohibition of independent installers in the cemetery; fees for permitting outside installers; and requirements that the installer post a bond with the cemetery. Baxley tried to prove that these requirements kept it out of the installation business in the defendant cemeteries and hurt its business as a memorial retailer. In its answer to special interrogatories, the jury found that there was no conspiracy among the defendants either to commit illegal tying (section 1) or to monopolize the installation market (section 2).

## I.

■ Baxley's first argument is that the district court erred in not submitting to the jury an instruction that section 1 liability could be based on individual tying violations by the cemetery defendants, rather than on conspiracy to tie. Baxley proceeded to trial on the Amended Complaint that we had before us in *Baxley I*. The Amended Complaint's tying count is titled "Plain-

tiff v. All Defendants—Sherman Act Section 1 Horizontal Conspiracy—Tying Arrangements" and makes numerous references to a tying conspiracy. In *Baxley I*, an appeal from the dismissal of the Amended Complaint, Baxley defended the Amended Complaint as one that stated a cause of action for conspiracy. Therefore, in holding the Amended Complaint adequate in *Baxley I*, we said it adequately stated a cause of action for tying conspiracy. 843 F.2d at 1156.

However, before trial, Baxley informed the district court that it intended to pursue both conspiracy and individual tying claims and argued that language within the tying count could be read to allege individual tying violations. The district court made it clear that it considered *Baxley I* to have foreclosed the possibility of Baxley proceeding on individual tying claims, because we characterized the tying count as a conspiracy count. Based on this reasoning, the district court refused to submit the individual tying claim to the jury.

■ Baxley argues that the district court's ruling was based on an erroneous conception of the effect of *Baxley I*. In the *Baxley I* appeal we were not asked to decide whether the Amended Complaint could be read as stating individual tying claims, and we had no need to rule on any such question in order to hold that the pleading adequately stated a cause of action. On remand, the district court may well have looked at the Amended Complaint and decided that individual claims were not adequately pleaded and, additionally, that the court would exercise its discretion not to permit Baxley to amend to state individual tying claims. Fed.R.Civ.P. 15(a). However, it was not proper for the district court to prevent Baxley from proceeding on individual tying claims on the basis of our disposition of an appeal in which the question was never raised. But although the district court's ruling may have been based on a misapprehension of the procedural posture of *Baxley I*, we hold that it was not erroneous for two reasons.

---

**3.** Grave "memorials" are defined to include flat    "markers" and upright "monuments."

First, Baxley points to no evidence that was excluded because of the district court's ruling (and in fact contends that it proved its case on individual claims). Second, Baxley did not prove the elements of an individual tying claim, and so the district court had no obligation to submit this theory to the jury.

■ There are two categories of tying claims under section I of the Sherman Act: a plaintiff must prove either that the tying arrangement in fact constitutes an unreasonable restraint of trade, *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 29, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984), or that the tying is of a type considered so inimical to competition that it is *per se* illegal without analysis of its actual effect on any particular market. *Id.* at 9, 104 S.Ct. at 1556. Baxley's proposed instruction was a *per se* instruction and, therefore, we test Baxley's proof against the elements of a *per se* tying claim.

■ The essence of a *per se* claim is that the defendant has such market power in the market for the tying product (here, cemetery lots) that it can force consumers to buy the tied product from it, though they might have preferred to buy the product elsewhere or not at all. *Jefferson Parish,* 466 U.S. at 12, 104 S.Ct. at 1558. On this element of market power, or ability to force, Baxley failed to make a submissible case, and therefore it was not entitled to submit its individual tying claims to the jury.

Market power can result from the fact that defendant enjoys a large share of the relevant market or the fact that the defendant offers a unique product that gives him an advantage over competitors, *id.* at 17, 104 S.Ct. at 1560–61, or some combination of these two factors, *See Rosebrough Monument Co. v. Memorial Park Cemetery*

*Ass'n,* 666 F.2d 1130, 1143 (8th Cir.1981) (*Rosebrough I*), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982); *Ringtown Wilbert Vault Works v. Schuylkill Memorial Park, Inc.,* 650 F.Supp. 823, 825 (E.D.Pa.1986). In this case, Baxley pleaded that the defendants as a group held 57% of the market and that the cemeteries benefitted from their unique locations and from the fact that in some cases consumers had no freedom of choice in selecting a cemetery lot because their families were already buried in the defendant cemeteries. We held this pleading to be sufficient to allege market power in *Baxley I.*

■ Now Baxley has been put to its proof. Baxley argues that it established market power to prove individual tying claims; this would require it to show that each defendant cemetery's share of the relevant market was sufficient to endow that defendant with enough market power to establish per se illegality. Analysis of market share must focus on a relevant market, defined in terms of product market (here, cemetery lots) and geographic market, which is the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product. *See Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 332, 81 S.Ct. 623, 628, 630, 5 L.Ed.2d 580 (1961) (Clayton Act Section 3); *Morton Bldgs. of Nebraska, Inc. v. Morton Bldgs., Inc.,* 531 F.2d 910, 918 (8th Cir.1976) (discussing Sherman Act section 2).

Baxley simply did not introduce any evidence of what the relevant geographic market was. The testimony of Baxley's expert, Dr. Ralph D. Scott, Jr., shows that he did not have information on which to base an opinion as to the geographic market.[4]

---

4. Dr. Scott testified:

A: Well, in terms of looking at the market for the tying product, there actually was not a study that I did. Drawing on my general knowledge as an economist, I think that that's a real common sense kind of thing. It's trivial.

Q: Did you have some information that was supplied to you in connection with your study?
A: In terms of looking at that particular market, no.
VIII Tr. at 133–34.
Q [By one of defendants' attorneys]: I'm going to hand you a copy of your deposition that was given on January 16, 1990.... Have

Scott merely assumed the relevant market was Pulaski and Saline Counties, which Mrs. Baxley had earlier testified was the primary area in which Baxley did business, and which was the only area he had any market data for.

This testimony provides no evidentiary basis for defining the geographic area. The fact that a party does all its business in a certain geographic area does not necessarily mean that that area constitutes the relevant geographic market. *United States v. Empire Gas Corp.*, 537 F.2d 296, 304 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir.1991); *L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 424–25 & n. 15 (11th Cir.1984). Baxley presented no other evidence to support its assumption of Saline and Pulaski Counties as the relevant area. Therefore, Baxley cannot rely on market share as part of its case for proving market power.

Baxley argues, however, that it does not need any showing of market share because the cemetery lots were a unique product that gave the cemeteries market power by virtue of their uniqueness and desirability. We therefore must determine whether Baxley proved that the defendant cemetery lots had the sort of uniqueness that can establish market power.

Cemetery lots are of course unique, as all land is unique, but the mere fact that the tying product is real estate does not convey market power. In *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), ownership of certain real estate was held sufficient to give the defendant market power. However, the market power resulted not

from the mere fact of uniqueness, but from the desirability of the land, which was "strategically located in checkerboard fashion amid private holdings and within economic distance of transportation facilities. Not only the testimony of various witnesses but common sense makes it evident that this particular land was often prized by those who purchased or leased it and was frequently essential to their business activities." *Id.* at 7, 78 S.Ct. at 519.

In numerous other tying cases involving real estate as the tying product, courts have held that the real estate must have some particular strategic or competitive importance in order to carry market power. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 453–54 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616, 628 (4th Cir.1979), *cert. denied* 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980); *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 59 (2d Cir.1980); *Blackwell v. Power Test Corp.*, 540 F.Supp. 802, 816 (D.N.J.1981), *aff'd*, 688 F.2d 818 (3d Cir.1982). *Cf. Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1127–30 (6th Cir. 1981) (upholding finding that airport real estate conferred market power to support tying claim); *Ware v. Trailer Mart, Inc.*, 623 F.2d 1150, 1153, 1154–55 (6th Cir.1980) (reversing summary judgment against plaintiff who claimed tying product was land that had "strategic location").

Moreover, this point has been indirectly treated by the Supreme Court in the *Jefferson Parish* case. In that case, the plaintiff argued that the defendant hospital derived market power from its location, because patients preferred to go to the closest hospital—which for a certain area, was of course, the defendant hospital. This amounts to the same "uniqueness"

---

you analyzed a relevant geographic market for the sale of cemetery lots?" "For the sale of cemetery lots? The answer is that I haven't explicitly looked at that, no. In fact, I don't think that would be limited. Maybe that's the United States or the world, depending on upon where you're from." ... [T]he people in central Arkansas that want to buy cemetery lots could buy them anywhere. For example, if you moved down here and lived here for a

year and died, I'm not sure your family would bury you here". Question, "My question, though, is have you analyzed a geographic market for competition in the sale of cemetery lots, as opposed to the sale of markers?", answer, "I think the answer to that is no". Was that your testimony?

A: Yes, it was.

VIII Tr. at 138–39.

argument Baxley makes, for the unique thing about real estate is its location. However, the Supreme Court in *Jefferson Parish* stated, "A preference of this kind [for the facility located nearest the consumer], however, is not necessarily probative of significant market power." 466 U.S. at 26, 104 S.Ct. at 1566. The Court noted that only thirty percent of the patients in the geographic area chose the defendant hospital; the fact that the other seventy percent went elsewhere tended to disprove market power. *Id.* at 27, 104 S.Ct. at 1566. We infer from this that uniqueness of location is not in itself adequate to establish market power, and that there must be other evidence showing that the location lends the defendant a competitive advantage others cannot meet.

In this case, the evidence disproves the idea that each of the defendant cemeteries derives significant market power from its location. First, even though Baxley failed to prove the geographic market, the thirty percent market share held inadequate to establish market power in *Jefferson Parish* coincides exactly with the twenty-nine to thirty-one percent[5] market share Baxley *claims* is held by all the defendant cemeteries together.[6] Of course, since there was a finding of no conspiracy, the market shares held by the defendants individually would be the relevant figures, and these figures would be much less than the thirty percent share held to show lack of market power in *Jefferson Parish.*

Second, the two witnesses in this case who testified about the "uniqueness" advantage disproved the idea that each of the individual defendants had a uniqueness advantage over competitors. Instead, Baxley's witnesses concentrated on establishing that "perpetual care" cemeteries as a group had an advantage over "rural cemeteries". "Perpetual care" cemeteries were described as highly regulated, highly manicured urban area cemeteries in which the cemetery owner has an obligation to pro-

vide continuing upkeep and in which lots are relatively expensive. "Rural" cemeteries are community, family or church cemeteries that may or may not be in rural areas, that may or may not be maintained, that have hardly any internal regulation, and in which lots are usually inexpensive or even free. Baxley's expert, Dr. Smith, counted five perpetual care cemeteries in addition to the four defendant cemeteries in what he assumed to be the relevant geographic area, with many rural cemeteries as well. Both Dr. Smith's and Gerald Baxley's testimony indicated that location is likely to be a far more important consideration for rural cemeteries than for perpetual care cemeteries such as the defendants', and that the perpetual care cemeteries compete quite actively with each other on other bases.

Dr. Smith's testimony does not bear out Baxley's argument that the real estate on which the four defendant perpetual care cemeteries are located gives each of them leverage over certain consumers. In fact, while Dr. Smith acknowledged that location may be a crucial factor in how people choose a rural cemetery, he indicated that perpetual care cemeteries are commercial operations that compete in terms of appearance ("green grass," "amenities"), price ("difference in income" could influence choice), and advertising. He gives us no evidence that any defendant cemetery has leverage over the residents of any geographic area, but rather suggests that these perpetual care cemeteries are fairly interchangeable. Gerald Baxley testified in the same vein when asked where people were likely to be buried: "Well, if the people live in a rural area, most of the time the people are buried near their home. But when they get to a perpetual care area, like in the Little Rock area here, it probably—whichever of the cemeteries actually sold them."

■ Baxley argues that the cemeteries get power over consumers because of the

---

"family plot" phenomenon, that is, that once a family member is buried in a particular cemetery, subsequent members of the family will be locked in to the same cemetery and want to purchase plots there. There was almost no evidence of the "family plot" situation at trial, but in the small amount of testimony on the subject, it appears that consumers interested in multiple family plots may buy multiple plots at once. If the family plots Baxley relies on consist of multiple grave spaces purchased at once, then there is no subsequent purchase of grave lots at which the buyer is forced to purchase from a particular cemetery. In the absence of any evidence of subsequent purchases of lots being dictated by previous burials in a cemetery, we cannot base a holding on this theory.[7]

We are aware of the case of *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207 (9th Cir.1977), in which certain cemeteries were held to have market power on the basis of uniqueness of their product. Indeed, we have cited *Moore* in our *Rosebrough I* decision, 666 F.2d at 1140–43, and in *Baxley I*, 843 F.2d at 1157. However, our *Rosebrough I* case did not depend entirely on cemetery lot uniqueness, but rather included market share, conspiracy between "virtually all" the cemeteries in the relevant market, and entry barriers in the market power equation. 666 F.2d at 1136, 1143. The discussion of uniqueness in the *Moore* case was quite brief, 550 F.2d at 1215 (1977), and we have no way of knowing whether the evidence at trial tended to prove that the cemeteries there derived significant market power from their locations.

At any rate, we believe *Jefferson Parish* and the weight of other authority require more than the mere fact that the product involved is real estate in order to prove market power. Here, the evidence showed that the location was only part of the product the perpetual care cemeteries had to offer, and that they competed in a number of other ways that were more determinative of the consumer's choice. Baxley simply did not prove that each of the defendant cemeteries had the significant market power required for *per se* illegal tying.

Since Baxley failed to make a *per se* tying case against each individual defendant, the district court did not err in failing to submit individual tying instructions.

## II.

■ Baxley argues that the district court erred in limiting the evidence to activities within the time period of 1980–86.[8] Baxley complains that the court either excluded or limited the use of several items of evidence dating before and after the operative period.[9]

We review evidentiary rulings only for abuse of discretion. We have previously stated in antitrust cases that though testimony outside of the operative period may well be admitted to show a course of con-

---

**7.** The family plot situation would also be inadequate to support a tying claim because Baxley introduced no evidence showing the number of consumers in this situation. Thus, we would be unable to determine whether the tying practice related to only "a handful of objecting customers", *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 796 (1st Cir.1988), or affected a substantial volume of interstate commerce. *See Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560.

**8.** The operative period included the limitations period of four years prior to the filing of the complaint, 15 U.S.C. § 15b (1988), and two years between the filing of the original Complaint and the Amended Complaint.

**9.** The evidence in question was:
   1. A 1970 letter from a former president of Griffin–Leggett to Mr. Baxley suggesting that Griffin–Leggett and Baxley agree not to compete in each other's trade areas, which was admitted for the limited purpose of establishing "background but not as proof of conspiracy."
   2. A 1978 letter from the Arkansas Cemetery Association president to its membership advising them to refer questions from the Attorney General's office to the Association's attorney, also admitted as background only.
   3. Testimony of an employee of another cemetery who said that in 1988 the defendant cemeteries had told her they "would rather not" have Baxley installing in their cemeteries, but "they did let them in there if he went by their rules and regulations."
   4. Testimony from an insurance broker that she was not able to obtain a performance bond for Baxley in 1989 that met the defendant cemeteries' rules and regulations.

duct continuing into the operative period, the trial court also has a duty to keep the evidence within reasonable time limits. *Kansas City Star Co. v. United States,* 240 F.2d 643, 651 (8th Cir.), *cert. denied,* 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957). *See generally United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 228–31, 60 S.Ct. 811, 846–48, 84 L.Ed. 1129 (1940). Considering the particular items of evidence in issue, we see no abuse of discretion in the district court's rulings.

### III.

Baxley next argues that the district court erred in permitting evidence and argument regarding the decision of *Pine Crest Memorial Park v. Burton,* 229 Ark. 1, 312 S.W.2d 919 (1958), an Arkansas case dealing with cemetery rules, including an exclusive installation rule.

Since Baxley failed to object at trial to the evidence about the *Pine Crest* case (despite the district court's admonition before trial to do so), it has not preserved the matter for appeal, *see Powell v. Burns,* 763 F.2d 337, 339 (8th Cir.1985), and we do not consider the admission plain error. *Id.*

Nor do we see any error in permitting the reference to *Pine Crest* in closing argument. In light of the fact that Baxley argued that the similarity of the defendants' rules could have resulted only from collusion, the district court acted within its discretion in permitting the defendants' attorney to argue the case as an alternative explanation for the similarity of the rules. *See Estes v. Dick Smith Ford, Inc.,* 856 F.2d 1097, 1106 (8th Cir.1988).

### IV.

Baxley complains that the district court refused to instruct the jury that the defendant cemeteries had committed tying violations as a matter of law. There was evidence that up until this court decided *Rosebrough I,* the defendant cemeteries each had a rule providing that only the

cemeteries could install memorials on their grounds, and Baxley argues that this constitutes a *per se* tying violation. This argument is concluded by our decision in part I, that Baxley failed to prove the element of market power in the tying market.

### V.

Baxley argues that the district court erroneously interpreted the *Noerr–Pennington* doctrine[10] in excluding evidence of litigation related activities by the defendants. We have reviewed the district court's ruling and hold that it correctly interpreted our case of *Razorback Ready Mix Concrete Co. v. Weaver,* 761 F.2d 484, 486 (8th Cir.1985), in excluding the evidence.

### VI.

Lastly, Baxley argues that the district court erred in refusing to allow it to amend its Amended Complaint after the close of discovery to add two parties (the present owners of Rest Hills Memorial Park and Forest Hills Memorial Park), and to allege that the practices described in the original complaint have been continuing. We see no abuse of discretion in this ruling. *See Weimer v. Amen,* 870 F.2d 1400, 1406–07 (8th Cir.1989).

### VII.

In sum, we discern no error in the district court's rulings and we affirm its judgment.

**10.** *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v.* *Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).