COLE, C.J., delivered the opinion of the court in which BATCHELER, J., joined in all but Part H.B., and MOORE, J., joined in all but Part II.C. BATCHELDER, J. (pp. 587-40), delivered a separate opinion concurring in part and dissenting from Part II.B. MOORE, J. (pp. 540-44), delivered a separate opinion concurring in part and dissenting from Part II.C. OPINION COLE, Chief Judge. The three named plaintiffs brought a purported class action alleging that the developers of their neighborhoods created agreements that violated both state and federal law by requiring the neighborhoods’ homeowners to pay for basic telecommunications services provided by Crystal Clear Technologies, LLC (“Crystal Clear”), an entity owned and controlled by the developers. The district court dismissed the plaintiffs’ federal claims for failure to state a claim and subsequently denied as futile the plaintiffs’ motion seeking leave to file an amended complaint. We affirm in part and reverse in part the district court’s denial of the plaintiffs’ motion seeking, leave to file an amended complaint. I. FACTS AND PROCEDURAL HISTORY The plaintiffs are homeowners in three centrally-planned neighborhoods in Thompson’s Station, a small town in Williamson County, Tennessee. The three neighborhoods, Canterbury, Bridgemore, and Tollgate, have hundreds of houses and over a thousand homeowners. Carbine & Associates, LLC, developed the neighborhoods through affiliated companies, Bridgemore Development Group, LLC, Tollgate Farms, LLC, and Hood Development, LLC. The developers also established and controlled owners’ associations for the neighborhoods. However, the developers have since transferred control of the owners’ associations to third-party entities not controlled by either the developers or homeowners. From 2006 to 2007, while under the developers’ control, the owners’ associations each entered into communications services agreements (the “Agreements”) with Crystal Clear. The Agreements grant Crystal Clear the right to provide telecommunications services to the neighborhoods for twenty-five years, with an option for Crystal Clear to unilaterally renew for an additional twenty-five years. In addition, the Agreements authorize Crystal Clear to be the exclusive agent for homeowners in procuring services from any outside providers and grant Crystal Clear the exclusive right to market services within the neighborhoods. Under the Agreements, homeowners must pay the owners’ associations a monthly assessment fee, which the associations then use to pay Crystal Clear for basic telecommunications services.. Homeowners must pay the fee whether they use Crystal Clear’s services or not. In addition, homeowners must make a onetime payment of $1,500 to Crystal Clear for the cost of constructing the telecommunications infrastructure in the neighborhoods. To facilitate the infrastructure’s construction, Crystal Clear also obtained a non-exclusive franchise agreement with Thompson’s Station that permitted Crystal Clear to use the service easements within the neighborhoods. Prior to executing the Agreements, Crystal Clear had no experience in the telecommunications-services industry. To provide services to the neighborhoods, Crystal Clear contracts with another provider, DirecTV, and charges a premium to homeowners in addition to the rate negotiated with DirecTV. Further, Crystal Clear does not provide services outside of the neighborhoods at issue in this case. The plaintiffs brought this suit and subsequently filed their first amended complaint, alleging both state and federal claims. The plaintiffs claimed that the Agreements constituted self-dealing, unjust enrichment, unconscionability, unlawful tying, market allocation, and unlawful exclusivity. The defendants moved to dismiss, arguing that the first amended complaint failed to assert allegations necessary for the federal claims and that the plaintiffs lack standing to bring claims on behalf of the owners’ associations. The district court dismissed the first amended complaint under Federal Rule of Civil Procedure 12(b)(6) without addressing the standing argument and declined to exercise supplemental jurisdiction over the remaining state-law claims. The plaintiffs then moved under Federal Rule of Civil Procedure 59 to alter or amend the judgment and under Rule 15 for leave to file a second amended complaint that asserted the same federal claims. The district court denied the plaintiffs’ motion after determining that the second amended complaint would fail to survive a motion to dismiss and was thus futile. The plaintiffs timely appealed from both the district court’s dismissal and its refusal to allow the second amended complaint. However, the plaintiffs agree that the second amended complaint reflects the plaintiffs’ most recent and developed pleading for purposes of this appeal. Accordingly, we consider only whether the district court erred in refusing to allow the second amended complaint under Rule 59 and Rule 15. Furthermore, the plaintiffs challenge only the district court’s decisions regarding their tying and exclusivity claims. Therefore, we do not address the dismissal of the market allocation claim. II. ANALYSIS A. Standard of Review We review de novo the denial of a motion seeking to amend a complaint where the denial is based on the determination that the amended complaint is futile because it would fail under a motion to dismiss. Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565, 572 (6th Cir. 2008). “To survive a motion to dismiss, a plaintiff must allege facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative level.” Bickerstaff v. Lucarelli, 830 F.3d 388, 396 (6th Cir. 2016) (citation and internal quotation marks omitted). “A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw ■ the reasonable inference that the defendant is liable for the misconduct alleged.” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). “This standard ‘does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct.]’” Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp., 830 F.3d 376, 383 (6th Cir. 2016) (quoting Twombly, 550 U.S. at 556, 127 S.Ct. 1955). This court must “construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff.” Bickerstaff, 830 F.3d at 396 (citation omitted). B. Unlawful Tying Under the Sherman Act “A tying arrangement is defined as an agreement, by a party to sell one product [a tying product] ... only on the condition that the buyer also purchases a different (or tied) product....” Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass’n, 524 F.3d 726, 732 (6th Cir. 2008) (quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). “The typical tying case involve[s] a seller’s attempt to exploit its economic power over one product or in one market to force a less desirable, tied product on a buyer.” Id. (internal quotation marks, omitted). “Illegal tying therefore occurs only if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.” Id. (internal quotation marks omitted). With regard to the impact on the tied market, “the controlling consideration is simply whether a total amount of business, substantial enough ... so as not to be merely de minimis, is foreclosed to competitors by the tie.... ” Fortner Enter., Inc. v. U.S. Steel Corp., 394 U.S. 495, 501, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). This latter requirement “makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie.” Id. Under their tying claim, the plaintiffs allege that the developers used their market power over the sale of homes in these neighborhoods to force the homeowners to purchase telecommunications services from Crystal Clear, thereby harming competition for the provision of telecommunications services and violating the Sherman Act, 15 U.S.C. § 1. The district court found that the first amended complaint failed to state a tying claim because it did not define the tying product market in alleging the defendants’ market power in the sale of homes. The second amended complaint' addressed this by defining the tying product market as centrally-planned communities within Thompson’s Station. The district court then determined that the second amended complaint alleges market power in a defined market, but that it. is futile because it fails to allege a substantial impact on the relevant tied market. On appeal, the plaintiffs contest this, arguing that the second amended complaint pleads a substantial impact on the tied market' by alleging that the defendants harmed competition for the' provision of telecommunications services. The defendants contend that the plaintiffs only pleaded a substantial impact on “telecommunications services in the Neighborhoods” rather than “commerce in the general market within which [telecommunications services] [are] sold.” (Crystal Clear Br. 19-20.) This court must therefore determine whether the plaintiffs pleaded a substantial impact within the relevant market for telecommunications services'. In doing so, this court is mindful that it’ must “construe the complaint in the light most favorable to the plaintiff .,. and draw all reasonable inferences in favor of the plaintiff.” See Bickerstaff, 830 F.3d at 396. While the plaintiffs allege that the arrangement “substantially]” affected “the sale of telecommunications in the Neighborhood[s],” the plaintiffs also allege more broadly that the arrangement “ha[s] harmed competition for the provision of telecommunications.” (R. 99-1, ¶¶ 90, 94.) The exact amount of commerce impacted by the tying arrangement is unclear at this stage, but the plaintiffs have alleged that the neighborhoods, and thus the list of potential plaintiffs, include hundreds of houses and over 1,000 homeowners subject to the arrangement. We can reasonably infer, that alleging harm to particular neighborhoods equates to alleging harm to the general, market that covers those neighborhoods. By alleging that the Agreements forced each household to pay one-time infrastructure fees of at least.$1,50Q and monthly assessment fees for Crystal Clear’s services, the plaintiffs have pleaded an amount of commerce that would be substantial in both the neighborhoods and the telecommunications services..market that covers those neighborhoods in Thompson’s Station, Williamson County, or beyond. See Fortner, 394 U.S. at 502, 89 S.Ct. 1252 (“[W]e cannot agree with respondents that a sum of almost $200,000 is paltry or ‘insubstantial.’”); Bell v. Cherokee Aviation Corp., 660 F.2d 1123, 1130 & n.8 (6th Cir. 1981) (holding that $140,000 over three years, “amount[ing] to. little more than $40,000 a year,” is not insubstantial); Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1578 (11th Cir. 1991) (holding that $30,000 to $70,000 is “clearly substantial”). We therefore conclude that the plaintiffs have pleaded a substantial impact on the relevant tied market. The defendants argue that, even if the plaintiffs sufficiently pleaded substantial harm on the relevant tied market, the district court erred in concluding that thé plaintiffs’ defined market for the tying product (the sale of homes) is proper. The proper definition of a tying product market and whether a defendant has market power within that market are fact-intensive questions best addressed following discovery. Mich. Division-Monument, 524 F.3d at 733. This is because the inquiry requires considering both the attributes of the product that make it unique from others and the geographic market within which consumers may seek comparable ¡products. See id. The plaintiffs allege that the neighborhoods represent the majority of centrally-planned neighborhoods that are located in a small-town setting in a county that is otherwise filled with more densely populated communities. The plaintiffs further allege that the .neighborhoods are unique from others because they provide the homeowners with access to superior area schools and local covenants that restrict home construction to houses typically purchased by middle to upper-middle income households. As the district court correctly noted, the plaintiffs’ allegations on the tying product market are plausible on their face. C. Exclusivity Under the Federal Telecommunications Act The Federal Communications Commission (“FCC”) has explicit authority to impose regulations specifying exclusive conduct that the Federal Telecommunications Act prohibits. See 47 U.S.C. § 548(c)(1); see also Nat. Cable & Telecomm. Ass’n v. FCC, 567 F.3d 659, 664-65 (D.C. Cir. 2009). Pursuant to this authority, the FCC issued the 2007 “Exclusivity Order” barring any cable distributor from “enforcing] or executing] any provision in a contract that grants it the exclusive right to provide any video programming service (alone or in combination with other services) .... ” In the Matter of Exclusive Service Contracts For Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments, 22 FCC Red. 20235, 20251 (2007) (codified by 47 C.F.R. § 76.2000(a)) (hereinafter “Exclusivity Order”). The plaintiffs allege that the Agreements violate the Exclusivity Order by making Crystal Clear the exclusive provider of services for the neighborhoods. The district court dismissed this claim, as alleged in the first amended complaint, noting that both the Agreements and the allegations contradicted the plaintiffs’ claim that the Agreements were exclusive contracts. As evidence of the arrangement’s exclusivity, the plaintiffs submitted with them proposed second amended complaint the Agreements and a letter sent by MBSC, the new owner of the Bridgemore development, stating that Crystal Clear refused “to give up its exclusive easements that enable it to be the only provider in Bridge-more.” (Letter from MBSC, R. 99-7, Pa-gelD 1626.) The district court concluded that the second amended complaint reiterated the allegations from the previous complaint and would therefore fail under a motion to dismiss. In addition, the district court found that the second amended complaint and the plain text of the Agreements contradicted the letter submitted by the plaintiffs. “The law is clear that [courts] may consider [a document] which was attached to the [c]omplaint ... in determining whether dismissal is proper.” Williams v. CitiMortgage, Inc., 498 Fed.Appx. 532, 536 (6th Cir. 2012) (per curiam); see also In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 466 (6th Cir. 2014). Further, “[w]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.” Williams, 498 Fed.Appx. at 536 (quoting N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend, 163 F.3d 449, 454 (7th Cir. 1998) (stating that this rule is “well-settled”)). The plaintiffs allege that the Agreements make Crystal Clear the exclusive provider by creating unlawful and unreasonable barriers to entry, such as requiring homeowners to pay for services regardless of usage, referencing Crystal Clear’s easements, and by granting Crystal Clear the exclusive right to negotiate with providers about access to deliver services to the neighborhoods. According to the plaintiffs, the cumulative effect of the barriers makes it both economically and practically unfeasible for any other provider to offer its services. The plaintiffs point to both the Agreements’ terms, which state that Crystal Clear will operate on an exclusive basis, and the MBSC letter, which describes Crystal Clear’s easements as exclusive and barring other providers. As the district court noted, there are several contradictions amongst the plaintiffs’ allegations and the Agreements’ terms. The plaintiffs allege both that the Agreements make Crystal Clear the exclusive provider and that Crystal Clear is not truly a provider, contracting with DirecTV to be the actual provider. The plaintiffs note the Agreements’ terms describing the arrangement as “exclusive,” but the Agreements’ terms mandate that homeowners must have access to other providers. The plaintiffs’ allege both that Crystal Clear’s easements are “exclusive” and that they are part of a non-exclusive franchise agreement. We conclude that these contradictions foreclose the plaintiffs’ exclusivity claim. The plaintiffs claim more than explicit exclusivity; they also claim that the structure and cumulative effect of the arrangement creates an exclusive provider relationship. But such allegations are insufficient to state an exclusivity claim. The prohibition imposed by the Exclusivity Order is limited by its terms to “building exclusivity clauses.” Exclusivity Order, 22 F.C.C. Red. at 20236 n.2. Such clauses “appear in contracts between [multichannel video programming distributors (“MVPDs”) ] and [multiple dwelling unit (“MDU”) ] owners or other real estate developments” and “prohibit any other MVPD from any access whatsoever to the premises of the MDU building or real estate development.” Id. Assuming Crystal Clear is an MVPD, the plaintiffs do not allege facts sufficient to show that the Agreements prohibit any other MVPD from “any access whatsoever” to the neighborhoods. Indeed, the Agreements specifically mandate that alternative providers be given access to the neighborhoods. The plaintiffs rely on a Fourth Circuit decision holding a defendant liable for violating the Exclusivity Order, but that decision is inapposite. Lansdowne on the Potomac Homeowners Ass’n, Inc. v. OpenBand at Lansdowne, LLC, 713 F.3d 187, 205-06 (4th Cir. 2013). As the Fourth Circuit found, the relevant contract in that case contained explicit exclusivity clauses. Id. Those clauses were contained in an easement that, unlike here, expressly granted the cable provider the sole right to develop telecommunications infrastructure. Id. at 205. And applicable, state law required the court to construe the easement, along with a series of related agreements, as a “single, intertwining contract” subject to the Exclusivity Order, notwithstanding the defendant’s argument that easements are not “contracts” subject to the order. Id. Interpreting the easement as part of a contract, the Fourth Circuit had “no difficulty” concluding that the contract contained explicit exclusivity clauses in violation of the Exclusivity Order. Id. In this case, by contrast, the plaintiffs do not allege facts sufficient to show that either the Agreements or easements at issue contain explicit exclusivity clauses. We therefore conclude that the plaintiffs have not sufficiently pleaded an exclusivity claim. III. CONCLUSION For the foregoing reasons, we reverse the district court’s denial of the plaintiffs’ motion seeking leave to file the second amended complaint on plaintiffs’ tying claim; we affirm the district court’s denial of the plaintiffs’ motion seeking leave to file the second amended complaint on plaintiffs’ exclusivity claim; and we remand this action to the district court for further proceedings consistent with this opinion.