NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0583n.06

No. 19-5124

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

N.D. MANAGEMENT, INC.; MEDAPPROACH HOLDINGS, INC.; W. BRADLEY DANIEL,

    Plaintiffs-Appellants,

v.

GREGORY D. HAWKINS; SHARON HAWKINS,

    Defendants-Appellees.

</td><td>

)
)
)
)
)
)
)
)
)
)
)

</td><td>

**FILED**
Nov 27, 2019
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

</td></tr>
</table>

Before: COLE, Chief Judge; MERRITT and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. MedApproach Holdings, Inc. and W. Bradley Daniel are engaged in a dispute with Gregory and Sharon Hawkins over the control of N.D. Management, Inc. (NDM). MedApproach Holdings, Daniel, and NDM brought this action against the Hawkinses for breach of contractual duty to negotiate in good faith and promissory estoppel, claiming that the Hawkinses had agreed to give Daniel all of the voting shares in NDM. But the United States District Court for the Southern District of New York had previously rejected this same argument. The district court therefore held that issue preclusion barred this action. For the reasons stated below, we AFFIRM.

I.

MedApproach Holdings, NDM, and Daniel appeal the district court's dismissal of their complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In this

posture, we take the plaintiffs' well-pleaded allegations as true. *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019). Accordingly, we present the facts in that light.

Daniel is the 100% owner of MedApproach Holdings. Medapproach Holdings is the general partner of MedApproach L.P., which is not party to the present suit. MedApproach L.P. holds a 75% share in NDM. Daniel also holds a proxy to vote the shares of NDM. Gregory Hawkins was one of the original investors in MedApproach L.P. He transferred his interest in the partnership to his wife Sharon Hawkins.

MedApproach Holdings filed a lawsuit against the Hawkinses in the United States District Court for the Middle District of Tennessee in 2011, asserting that the Hawkinses had failed to pay management and other fees owed to MedApproach Holdings. *MedApproach Holdings, Inc. v. Hawkins*, No. 3:11-cv-1199 (M.D. Tenn. dismissed Oct. 11, 2016) (The Tennessee lawsuit). In 2013, while the Tennessee lawsuit was ongoing, Sharon Hawkins filed a lawsuit against MedApproach Holdings and Daniel in the Southern District of New York, challenging the proxy held by Daniel to vote and control the shares of NDM. *Hawkins ex rel. MedApproach, L.P. v. MedApproach Holdings, Inc.*, No. 1:13-cv-05434-ALC-SDA (S.D.N.Y. filed Aug. 2, 2013) (The New York lawsuit). The New York lawsuit is ongoing.

On February 2, 2016, Daniel and Gregory Hawkins, who was acting on Sharon's behalf, held a daylong settlement conference in Nashville. At the meeting, the parties marked up an earlier letter dated September 16, 2014 (The Settlement Agreement). The letter called for the dismissal of the New York and Tennessee lawsuits and outlined terms relating to the corporate governance and organization of NDM. The parties wrote by hand "Agreed" next to all the terms in the letter, except for § 1.B, and initialed both sides of the letter. Section 1.B reads, "Pro rata distribution of non-voting shares of NDM to beneficial owners with voting shares distributed to Brad Daniel."

Next to that term the parties wrote, "(Subject to attorney review and discussion)." At the conclusion of the meeting, Daniel and Hawkins shook hands and congratulated each other on reaching an agreement.

In reliance on the Settlement Agreement, MedApproach Holdings retained outside experts to analyze the reorganization of NDM contemplated in the Settlement Agreement and draft the necessary corporate documents. It also tendered certain payments to the Hawkinses as contemplated in the agreement. The Hawkinses, however, never cashed or deposited the checks they received, and in subsequent communications they insisted that Sharon Hawkins be able to exercise a "veto power" over NDM's actions. The parties dismissed the Tennessee lawsuit in October 2016 pursuant to a separate written settlement agreement, but the Hawkinses continued to prosecute the New York lawsuit with the stated purpose of "gain[ing] control" over NDM.

MedApproach and Daniel filed a motion to enforce the Settlement Agreement in the New York lawsuit in March 2017. They argued that the Settlement Agreement was an enforceable contract under New York law and that the parties had agreed to all of its terms. The parties argued in detail whether the Hawkinses had agreed to § 1.B in light of the notation written next to it.

Applying the four-factor test for contract formation laid out in *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985), a magistrate judge issued a report and recommendation concluding that the Settlement Agreement was not enforceable. *Hawkins ex rel. MedApproach, L.P. v. MedApproach Holdings, Inc.*, No. 1:13-cv-05434-ALC-SDA, 2018 WL 1371404 (S.D.N.Y. Jan. 9, 2018). Under the first factor, he found that "the 'subject to' language" written next to § 1.B "constituted an express reservation of the right not to be bound." *Id.* at *3. He found that the other three factors also weighed against MedApproach Holdings and Daniel. *Id.* at *3–4.

The district court adopted the magistrate judge's report and recommendation in full. *Hawkins ex rel. MedApproach, L.P. v. MedApproach Holdings, Inc.*, No. 1:13-cv-05434-ALC-SDA, 2018 WL 1384502 (S.D.N.Y. Mar. 15, 2018). The court's opinion placed particular emphasis on the first *Winston* factor:

> Relying on a New York Court of Appeals decision, Magistrate Judge Aaron concluded that "subject to" is the equivalent of "condition or depending on." This is undoubtedly correct. On its face, the language of the notation indicates that the term remained an open issue. Contrary to Defendants' assertion, the notation is not akin to a provision indicating that parties will enter a more formalized agreement pursuant to the terms. If the phrase "subject to attorney review and discussion" called for the drafting of additional corporate documents, then there would be text in the agreement indicating just that, as was the case in *Suarez*. But there is not. On the contrary, the words "attorney *review and discussion*" demonstrate that the issue was open and subject to further negotiation. Accordingly, the Court agrees with Judge Aaron's finding that the factor weighs in favor of non-enforcement. This should end the inquiry.

*Id.* at *1 (citations omitted). The district court then concluded without analysis that the magistrate judge had "correctly weighed" the other three *Winston* factors. *Id.* at *2.

MedApproach Holdings, NDM, and Daniel (collectively, MedApproach[1]) then filed this suit against the Hawkinses in the Chancery Court for Davidson County, Tennessee. MedApproach brought claims for breach of contractual duty to negotiate in good faith and promissory estoppel.[2] In the first count, MedApproach alleges that the Settlement Agreement "bound the parties . . . to pursue NDM's reorganization along the terms set forth in the February 2, 2016 Settlement Agreement in good faith." MedApproach claims that the Hawkinses breached that duty by demanding a veto power over NDM and continuing to prosecute the New York lawsuit. The

---

[1] We will also refer to MedApproach Holdings and Daniel collectively as "MedApproach" when discussing the New York lawsuit and the February 2, 2016 settlement conference.

[2] MedApproach also brought a third claim for abuse of process, whose dismissal it does not appeal.

second count is similar: MedApproach alleges that the Hawkinses "promised to pursue the terms set forth in the February 2, 2016 Settlement Agreement" and that MedApproach reasonably relied on their promise. The complaint states that the Hawkinses broke their promise to MedApproach's detriment by demanding "supervoting shares of NDM."

The Hawkinses removed the case to the United States District Court for the Middle District of Tennessee, invoking that court's diversity jurisdiction. They filed a motion to dismiss under Rule 12(b)(6), which the district court granted. *N.D. Mgmt., Inc. v. Hawkins*, No. 3:18-CV-00890, 2019 WL 266715 (M.D. Tenn. Jan. 18, 2019).

The district court held that "plaintiffs are collaterally estopped from arguing that the Settlement Agreement conclusively binds the Hawkinses to non-voting shares of NDM" and that issue preclusion barred both of MedApproach's claims for relief. *Id.* at *5. It further rejected the argument that MedApproach had an actionable claim for breach of contractual duty to negotiate in good faith despite issue preclusion, because Tennessee law governs the settlement negotiations and Tennessee law does not recognize claims for breach of a duty to negotiate in good faith. *Id.* The district court did not consider whether claim preclusion barred MedApproach's suit because the Hawkinses did not raise this issue in their motion to dismiss. *Id.* at *4 n.5.

MedApproach filed a timely notice of appeal.

## II.

"We review *de novo* a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 412 (6th Cir. 2019) (quoting *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012)). "To survive a motion to dismiss, a plaintiff must allege facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative

level." *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 534 (6th Cir. 2017) (quoting *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

MedApproach argues that issue preclusion does not apply here because the duty to negotiate in good faith and promissory estoppel were never at issue in the New York lawsuit. It maintains that it has therefore pleaded a plausible claim for breach of contractual duty to negotiate in good faith under New York law. The district court erred in applying Tennessee law to the Settlement Agreement, MedApproach contends, because the parties had agreed in the New York lawsuit that New York law applied. MedApproach argues in the alternative that if Tennessee law applies, Tennessee law "should be changed" to recognize a contractual duty to negotiate in good faith. MedApproach also claims that it has stated a plausible claim for promissory estoppel under Tennessee law.

The Hawkinses argue in response that the application of issue preclusion is fatal to MedApproach's remaining claims, because both claims rely on a premise already rejected in the New York litigation—namely, that the Hawkinses agreed to accept only non-voting shares of NDM. We agree with the Hawkinses.

The application of issue preclusion is a question of law that we review de novo. *Ga.-Pac. Consumer Prods. L.P. v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1097 (6th Cir. 2012). As an initial matter, we must determine which preclusion rules apply. The district court applied federal issue preclusion rules in its decision below, and the parties briefed their arguments under the same rules on appeal. But New York, not federal, preclusion rules apply here. It is true that a federal

court issued the order in the New York lawsuit and that the "preclusive effect of a federal-court judgment is determined by federal common law." *Amos v. PPG Indus., Inc.*, 699 F.3d 448, 451 (6th Cir. 2012) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008)). But the parties' earlier case was before the federal court on diversity jurisdiction, and the court applied New York substantive law. *Hawkins ex rel. MedApproach, L.P.*, 2018 WL 1371404, at *2 n.4. Where a prior decision comes from a federal court sitting in diversity, "the federally prescribed rule of decision" is to apply the preclusion rules "that would be applied by state courts in the State in which the federal diversity court sits," except where the state preclusion rules are "incompatible with federal interests." *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508–09 (2001); *accord Taylor*, 553 U.S. at 891 n.4 ("For judgments in diversity cases, federal law incorporates the rules of preclusion applied by the State in which the rendering court sits." (citation omitted)).

Admittedly, we held in *Rawe v. Liberty Mutual Fire Insurance Co.* that "federal res judicata principles apply" in "successive diversity actions." 462 F.3d 521, 528 (6th Cir. 2006) (citing *J.Z.G. Res., Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 214 (6th Cir. 1996)). But although *Rawe* was decided after *Semtek*, *Rawe* does not bind us here. The general rule that we must follow the published decisions of a prior panel "yields when the prior panel's reasoning has been undercut or abrogated by a decision of the Supreme Court." *United States v. White*, 920 F.3d 1109, 1113 (6th Cir. 2019) (citing *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720–21 (6th Cir. 2016)). This is so "even in the unusual situation where binding circuit precedent overlooked earlier Supreme Court authority," *Husted*, 831 F.3d at 720, which is the case here. *Rawe* did not discuss *Semtek* and offered no support for its conclusion other than to cite to a pre-*Semtek* decision of this court. 462 F.3d at 528. Because *Semtek* undercuts *Rawe*'s reliance on our earlier caselaw, we must follow *Semtek* rather than *Rawe*. *See Malcmacher v. Jesse*, __ F. App'x __, Nos. 18-3698, 18-3705, 2019

WL 4316796, at *3 n.1 (6th Cir. Sept. 12, 2019) (applying *Semtek* rather than *Rawe*); *In re Leonard*, 644 F. App'x 612, 616 (6th Cir. 2016) (same); *Wayne Cty. Hosp., Inc. v. Jakobson*, 567 F. App'x 314, 317 (6th Cir. 2014) (same). Moreover, the Supreme Court has reaffirmed *Semtek*'s holding that state preclusion rules apply to judgments in federal diversity cases in a decision issued after *Rawe*. *See Taylor*, 553 U.S. at 891 n.4. Accordingly, because the federal court that decided the parties' earlier case under its diversity jurisdiction sat in New York, we must apply New York preclusion rules to its decision.

Under New York law, issue preclusion or—as New York courts prefer to call it—collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue raised in a prior action or proceeding and decided against that party or those in privity." *Buechel v. Bain*, 766 N.E.2d 914, 919 (N.Y. 2001) (citing *Ryan v. N.Y. Tel. Co.*, 467 N.E.2d 487, 490 (N.Y. 1984)). For the doctrine to apply, "[t]here must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and there must have been a full and fair opportunity to contest the decision now said to be controlling." *Launders v. Steinberg*, 876 N.E.2d 901, 902 (N.Y. 2007) (alteration in original) (quoting *Buechel*, 766 N.E.2d at 919). "The party seeking to invoke collateral estoppel has the burden to show the identity of the issues, while the party trying to avoid application of the doctrine must establish the lack of a full and fair opportunity to litigate." *In re Dunn*, 27 N.E.3d 465, 468 (N.Y. 2015) (citing *Kaufman v. Eli Lilly & Co.*, 482 N.E.2d 63, 67 (N.Y. 1985)).

MedApproach and the Hawkinses dispute only the identity-of-issues requirement. This requirement is satisfied only if the same issue has been "'actually litigated and determined' in a prior action." *Kaufman*, 482 N.E.2d at 68 (quoting *Restatement 2d of Judgments* § 27 (1982)). The issue in question need not have been the ultimate issue in the case, so long as it was

"necessarily decided and material in the first action." *Parker v. Blauvelt Volunteer Fire Co.*, 712 N.E.2d 647, 651 (N.Y. 1999). An identity of issues can exist "whether or not" a party's "causes of action are the same." *Id.* (quoting *Ryan*, 467 N.E.2d at 490).

In order to resolve MedApproach's claim in the New York litigation that the parties had formed an enforceable settlement contract, the district court first had to decide whether the Hawkinses had agreed to § 1.B of the proposed Settlement Agreement, which would have limited them to receiving only non-voting shares of NDM. Both parties briefed the question in detail. The magistrate judge found that "the 'subject to' language" written next to § 1.B "constituted an express reservation of the right not to be bound." *Hawkins ex rel. MedApproach, L.P.*, 2018 WL 1371404, at *3. Adopting the magistrate judge's report, the district court held, "Contrary to Defendants' assertion, the notation is not akin to a provision indicating that parties will enter a more formalized agreement pursuant to the terms. . . . [T]he words 'attorney review and discussion' demonstrate that the issue was open and subject to further negotiation." *Hawkins ex rel. MedApproach, L.P.*, 2018 WL 1384502, at *1. In other words, the Hawkinses had made no commitment as to the voting structure of NDM and had expressly refused to agree to accept only non-voting shares.

This determination was necessary to the district court's ruling that no enforceable settlement contract existed. The court held that "where there is a writing between the parties showing that one party did not intend to be bound[,] a court need look no further than the first factor." *Id.* (alteration in original) (quoting *Kaczmarcysk v. Dutton*, 414 F. App'x 354, 355 (2d Cir. 2011)). Accordingly, upon determining that the Hawkinses did not agree to § 1.B, the district court concluded, "This should end the inquiry." *Id.* (citing *Kaczmarcysk*, 414 F. App'x at 355). MedApproach is therefore collaterally estopped from re-raising the issue of whether the

Hawkinses agreed to accept only non-voting shares of NDM. The issue was actually argued and determined, and the court's ruling on the issue was necessary to its ultimate ruling on the enforceability of the Settlement Agreement.

MedApproach nevertheless argues that collateral estoppel does not bar its claims for relief because the New York litigation "focused solely on the enforcement of the Agreement as written" and never addressed the duty to negotiate in good faith or promissory estoppel. But this is just to argue that collateral estoppel does not apply because MedApproach's causes of action have changed, a proposition the New York Court of Appeals has expressly rejected. *See Parker*, 712 N.E.2d at 651. Collateral estoppel may not bar MedApproach's claims themselves, but it does bar MedApproach from supporting its claims by alleging that the Hawkinses agreed to accept only non-voting shares of NDM. Once collateral estoppel is applied, the question becomes whether MedApproach's complaint states a plausible claim for relief without this barred allegation.

Because both of MedApproach's claims for relief are premised on the allegation that the Hawkinses agreed to accept only non-voting shares of NDM, the application of collateral estoppel is fatal to the complaint. In the first count, MedApproach claims that the parties entered into a valid "Type II" preliminary agreement under New York law. *See Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005); *IDT Corp. v. Tyco Grp.*, 918 N.E.2d 913, 915 n.2 (N.Y. 2009). Unlike a "Type I" preliminary agreement, which "is fully binding as to the final contractual goal, a Type II agreement 'does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework.'" *Brown*, 420 F.3d at 157 (alteration in original) (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)). "This obligation bars a party from 'renouncing the deal, abandoning the negotiations, or insisting on conditions that do not

conform to the preliminary agreement.'" *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)).

MedApproach alleges that the parties "agreed to the terms of the February 2, 2016 Settlement Agreement" and "to complete all remaining corporate documents" necessary to implement the Settlement Agreement "in good faith." The complaint states that the parties agreed that the corporate documents "would reflect that Ms. Hawkins, as a beneficial owner, would receive only non-voting shares of NDM." The Hawkinses breached their duty to complete the corporate documents in good faith, MedApproach alleges, by "later demand[ing] that that they receive a 'veto' over NDM" even though "[t]his was directly contrary to Section 1(B) of the February 2, 2016 Settlement Agreement which clearly dictates that [Sharon Hawkins] would only receive non-voting shares in NDM." MedApproach further alleges that the Hawkinses acted in bad faith by continuing to prosecute the New York lawsuit with the express purpose of "'gain[ing] control' over NDM" "despite having agreed to maintain the status quo of NDM in the Settlement Agreement."

The allegation that the Hawkinses agreed to complete corporate documents limiting them to non-voting shares of NDM directly contradicts the Southern District of New York's ruling that the "issue" of control over NDM "was open and subject to further negotiation." *Hawkins ex rel. MedApproach, L.P.*, 2018 WL 1384502, at *1. MedApproach is collaterally estopped from making this allegation and consequently fails to plead that the Hawkinses violated any agreed-upon duty when they demanded a veto power over NDM's activities. Similarly, since MedApproach may not allege that the Hawkinses agreed to give Daniel all of NDM's voting shares, the complaint does not properly identify any agreed-upon duty that the Hawkinses violated

by continuing to prosecute their New York lawsuit concerning control over NDM. And since the complaint does not allege any other concrete acts of breach by the Hawkinses, it alleges no facts that would allow us to reasonably infer that they are liable for breach of contractual duty to negotiate in good faith. MedApproach consequently fails to state a plausible claim for relief on this count under New York law.

Turning to MedApproach's alternative argument, MedApproach does not identify any respect in which a claim for breach of contractual duty to negotiate in good faith under its proposed rule of Tennessee law would differ from the same claim under New York law. Thus, even if MedApproach is right that the Tennessee Supreme Court would change Tennessee law to recognize claims for breach of duty to negotiate in good faith, it would still fail to state a plausible claim for relief for the same reasons that it cannot state one under New York law. Accordingly, MedApproach fails to state a claim for relief on its first count regardless of which state's law governs.

The application of collateral estoppel is also fatal to MedApproach's second count for promissory estoppel. Plaintiffs making a claim of promissory estoppel under Tennessee law must establish "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that they reasonably relied upon the promise to their detriment." *Kinard v. Nationstar Mortg., LLC*, 572 S.W.3d 197, 210 (Tenn. Ct. App. 2018) (quoting *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007)). The complaint alleges that the Hawkinses "promised . . . that they would pursue in good faith a reorganization of NDM that involved Mr. Daniel holding voting shares and Defendants holding non-voting shares." But MedApproach is collaterally estopped from alleging that the Hawkinses committed themselves to receiving only non-voting shares of NDM. The complaint does not identify any other concrete

promise on which MedApproach reasonably relied. MedApproach therefore fails to state a plausible claim for promissory estoppel.

Finally, New York law requires us to consider not just the formal requirements of collateral estoppel but also "whether relitigation should be permitted . . . in light of . . . competing policy considerations, including fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results." *Jeffreys v. Griffin*, 801 N.E.2d 404, 408 (N.Y. 2003) (quoting *Staatsburg Water Co. v. Staatsburg Fire Dist.*, 527 N.E.2d 754, 756 (N.Y. 1988)). These policy considerations favor preventing the parties from relitigating the issue of whether they had agreed that Daniel would receive all the voting shares of NDM. The parties in the two lawsuits are the same, and this issue was the central point of contention in the New York lawsuit. The parties argued the question both before a magistrate judge and before a district court. Fairness to the parties thus does not require another opportunity to litigate the issue. Judicial economy and consideration of the litigants' resources also favor the application of collateral estoppel. The parties briefed the question twice in the New York lawsuit, and two federal judges authored opinions resolving it. It would create needless expense for both the parties and the courts to allow a second action to go forward on an issue that has already been thoroughly argued and decided. Finally, relitigation would create the risk of inconsistent outcomes, and there is no reason to believe *ex ante* that a later federal district court's judgment would be any more accurate than an earlier one's. The equitable considerations identified by New York law therefore confirm our holding that collateral estoppel bars MedApproach from stating a plausible claim for relief.

\* \* \*

We AFFIRM the district court's dismissal of MedApproach's complaint for failure to state a claim.