NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0295n.06

No. 20-6423

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

GULFSIDE CASINO PARTNERSHIP,

    Plaintiff-Appellant,

v.

CHURCHILL DOWNS INCORPORATED,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jun 22, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

BEFORE: SUTTON, Chief Judge; SUHRHEINRICH and NALBANDIAN, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

## I.     BACKGROUND

This case arises from a dispute about the right to purchase tickets for premium seats at the famed Churchill Downs Racetrack, home to the Kentucky Oaks and the Kentucky Derby. In August 2004, Defendant Churchill Downs Incorporated ("Churchill Downs") entered into a Personal Seat License Agreement ("PSL") with Frank and Sonia Cain. The Cains' paid $70,000 for the right and obligation to purchase Table B-04, Seats 1–8, in "Millionaires Row 6" for the Oaks and the Derby for a thirty-year term. For each of these events, the PSL required the purchase of the seats at "the then-current prices." The terms of the PSL dictated that if the Cains failed to purchase these seats Churchill Downs would be entitled to revoke the agreement and retain the entire $70,000.

In 2012, Mr. Cain sold the PSL to Plaintiff Gulfside Casino Partnership ("Gulfside") for $300,000. Churchill Downs did not receive any of the $300,000, but it did enter into an updated PSL with Gulfside that reflected the change in name of the PSL holder from the Cains to Gulfside and confirmed that the "License Term" would be the remaining twenty-two years on the original PSL.

Section 8 of the PSL, the so-called Damage or Destruction Clause, reads in relevant part as follows:

> In the event of any damage to or destruction of the Seats or the surrounding areas ("Casualty Damage") or construction at Churchill Downs Racetrack, reconfiguration of seating or any other cause (collectively "Other Cause") which renders the Seats unusable or otherwise unsuitable for purposes of this Agreement, as determined in the sole discretion of Licensor, and, in such event, which Casualty Damage or Other Cause was not caused by the Licensee or any of its guests or invitees, Licensor may, without any breach of this Agreement and without any further obligation to Licensee, at its option either: (i) relocate to a comparable location (as determined by Licensor) the seats for which Licensee has a right to purchase tickets under the Personal Seat License; or (ii) terminate this Agreement as of the date of such Casualty Damage or Other Cause and refund to Licensee a prorated portion (as determined by Licensor) of the License Fee.

On November 9, 2019, Churchill Downs sent a letter ("the Letter") to Gulfside, which explained that renovations to Millionaires Row 6 would create an entirely new floorplan and layout for the space. The Letter further explained that as a result of this renovation the tables covered by the PSL would "not be available for purchase." It included details about the planned renovation, which involved going from more than 70 eight-seat tables to having predominantly smaller tables of six and four along with soft seating. Churchill Downs offered Gulfside the option to select new seating in the renovated Millionaire's row. If Gulfside exercised this option, the new seats would cost approximately $10,000 per person per event, whereas previously Gulfside had been paying between $1,330 and $1,968 per seat. Alternatively, if Gulfside chose not to select new seats,

Churchill Downs offered to terminate the contract and refund Gulfside the pro-rated portion of the PSL for $35,000.

Gulfside filed suit in January 2020, alleging that Churchill Downs had breached the terms of the PSL by refusing to offer replacement seats in Millionaires Row at the previous price. They asserted four claims: breach of contract, breach of the implied duty of good faith and fair dealing, violation of the Kentucky Consumer Protection Act, and unjust enrichment. Gulfside alleged, and still maintains, that there is a plethora of "comparable seating" and that they should have been offered that seating at the prices that were in effect at the time the PSL went into effect.

Though it repeatedly referenced the Letter in the complaint, Gulfside did not attach it as an exhibit. Churchill Downs attached the Letter to its motion to dismiss along with diagrams showing the Millionaires Row 6 both before and after the renovation.

After considering the complaint and the exhibits attached to the motion to dismiss, the district court granted Churchill Downs's motion and dismissed all of Gulfside's claims. This appeal followed.

## II.     ANALYSIS

We review de novo a district court's decision to grant a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *Schwamberger v. Marion Cnty. Bd. of Elections*, 988 F.3d 851, 856 (6th Cir. 2021). To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Twombly*, 550 U.S. at 545 (internal quotation marks and alteration omitted). The

court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016) (quotation omitted).

Gulfside argues that the district court should not have considered the Letter because it was not a written instrument and because it was not attached to the complaint. The district court relied upon our holding in *Cates v. Crystal Clear Technologies, LLC*, where we found that "[w]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegation," to dismiss Gulfside's breach of contract claim. 874 F.3d 530, 536 (6th Cir. 2017) (internal quotation omitted). Gulfside argues that *Cates* is inapplicable because the Letter and its attachments are not "written instruments."

Black's Law Dictionary defines "instrument" as "[a] written legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." Black's Law Dictionary (11th ed. 2019). We agree that the Letter does not meet this definition, but this argument is ultimately a red herring. The court is not limited to only considering documents that fall within this narrow definition "legal instruments." Sixth Circuit case law is very clear that courts may consider documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims. *See, e.g.*, *Rondigo LLC v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011). This policy makes sense because a plaintiff would otherwise have the ability to survive a motion to dismiss "simply by failing to attach a dispositive document upon which it relied." *Weiner v. Klais & Co., Inc,* 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002). Nothing in our case law suggests we are prevented from considering documents that are not formal legal instruments if they are referenced in the complaint and central to the plaintiff's claims, and this court has

considered less formal documents than the Letter before. *See, e.g., Seaton v. TripAdvisor LLC*, 728 F.3d 592, 595 (6th Cir. 2013) (allowing consideration of a screenshot of an Internet list that was referred to in the plaintiff's complaint).

Plaintiff's reliance on *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend* is unavailing. 163 F.3d 449 (7th Cir. 1998).[1] In that case, the plaintiff alleged that a convention center adopted an anti-gun policy for the purpose of suppressing his political and commercial speech. *Id.* at 450–52, 454. The plaintiff attached letters to its own complaint to show the dates of communications between the parties. *Id.* at 455. The Seventh Circuit found that it was improper to favor the explanations for the policy contained in the letters over the explanation offered by the plaintiff in the complaint itself. *Id.* at 455–56. It reasoned that the letters were not central to the complaint, specifically distinguishing the case from prior cases where dismissal was appropriate because "plaintiffs [had] relied upon these documents to form the basis of their claim." *Id*. at 456 (quoting *In re Wade*, 969 F.2d 241, 249–50 (7th Cir. 1992)). Our case is precisely the scenario from which *Northern Indiana* sought to distinguish itself, because the Letter with its attachments is central to Gulfside's claim that Churchill Downs breached the terms of the PSL. Gulfside relies upon the Letter as demonstrating that there was a breach of contract, which is Gulfside's primary claim in its complaint.

Gulfside next argues that the district court could only have considered the Letter had it been attached to the complaint. This argument belies the policy reason for allowing consideration of such documents to begin with, that is, preventing plaintiffs from strategically avoiding dismissal by failing to attach documents upon which their complaint relies that undercut their own arguments. We therefore find that the district court did not err in considering the Letter.

---

[1] The *Cates* court quoted *Northern Indiana* when stating the rule that written instruments attached to the complaint trump contradicting allegations made by the plaintiff. 874 F.3d at 536.

We now turn to the breach of contract claim at the heart of this case. Gulfside alleges that Churchill Downs breached the PSL by invoking the Section 8 damage-or-destruction clause. "Under Kentucky law, in order to recover in any action based on breach of a contract, a plaintiff must show the existence and the breach of a contractually imposed duty." *Lenning v. Com. Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001) (citing *Strong v. Louisville & Nashville R. Co.*, 43 S.W.2d 11, 13 (Ky. 1931)). In its complaint, Gulfside offered three arguments as to how Churchill Downs breached the PSL. The district court addressed each, finding that none sufficiently demonstrated breach. We agree.

First, Gulfside alleged that "there was no damage, destruction, unforeseen event[,] or circumstance[] that caused Gulfside's seats to become unsuitable or unusable." This may be true, but the damage-and-destruction clause of the PSL is also triggered by "construction at Churchill Downs Racetrack, reconfiguration of seating or any other cause (collectively "Other Cause") which renders the Seats unusable or otherwise unsuitable . . . as determined in the sole discretion of Licensor."[2] Here, construction and reconfiguration of Millionaires Row 6 rendered Gulfside's seats unavailable because no such seats existed in the new layout. The floorplan that was attached to the Letter explained as much, stating that the seats would be "unavailable," and including diagrams of the planned renovation that demonstrate that Table B-04 would cease to exist and that there are no similarly located 8-person tables in Millionaires Row. Thus, Churchill Downs was firmly within its rights to invoke Section 8 of the PSL.

---

[2] Gulfside points to Section 1(b) of the PSL as supporting the notion that Churchill Downs was obligated to provide comparable seating in the event of a reconfiguration. That Section provides that "Licensor reserves the right to reconfigure, or otherwise change, in its discretion, the location of the Seats to a comparable location (as determined by the Licensor)." This Section neither obligates Churchill Down to relocate the seats, nor does it rebut the notion that when seats become "unusable or otherwise unsuitable" Churchill Downs has the right to terminate the PSL.

Second, and related to the first argument, Gulfside argues that Churchill Downs impermissibly substituted an "unavailable" standard with the "unusable or otherwise unsuitable" standard required under the PSL. Gulfside asserts that Churchill Downs's interpretation of "unusable," "unsuitable," and "comparable seating" does not meet the ordinary meaning of these terms. It offers no further explanation for this point, and indeed simple logic proves Gulfside wrong. Seats that do not exist are "unsuitable" and "unusable." The use of the word "unavailable" does not negate this premise. Furthermore, as the district court recognized, the Letter explicitly invoked Section 8 of the PSL, and Churchill Downs does not dispute that the "unusable or otherwise unsuitable" standard contained therein governs this dispute. As we stated above, we agree with the district court that when seats no longer exist, they are "unusable or otherwise unsuitable."

Finally, Gulfside claims that there were numerous other comparable seats that Churchill Downs could have offered to replace Table B-04. Because it did not do so, they argue that Churchill Downs is in breach. This argument is flawed for several reasons. First, we note that Gulfside offers no explanation for its claim that such seating was available. Indeed, the PSL provides that what constitutes a "comparable location" is a determination to be made by the Licensor. Second, the PSL does not obligate Churchill Downs to offer comparable seating, it merely gives Churchill Downs option of doing so as an alternative to termination. Third, even accepting Gulfside's assertion that there is available comparable seating as true, Churchill Downs did offer to replace the B-04 seats with other seating in Millionaires Row. Gulfside declined to accept this offer because it did not want to pay the increased prices for the seating. Gulfside argues that comparable seating existed outside of Millionaires Row, but this does not help its cause. Gulfside itself recognizes that the experience of attending events at Churchill Downs goes well

beyond the seats one uses to watch a race. Gulfside cannot simultaneously claim that "[t]he purpose of the PSL is to view the races from Millionaires Row" and that "there could be numerous other 'comparable locations' for seating at Churchill Downs in locations different than the 'Millionaires Row 6' of the facility." Because Churchill Downs was not obligated to provide comparable seating at all, much less at the same location for the pre-renovation price, Gulfside has failed to assert a claim for breach of contract on this ground.

Gulfside recognizes that its claims for unjust enrichment and breach of the duty of good faith and fair dealing depend in large part on the central breach of contract claim. Without the breach of contract claim, these two claims melt away. Because we find that the district court correctly dismissed this central claim, we likewise agree that dismissal of the unjust enrichment and good faith and fair dealing claims was appropriate. *See Codell Constr. Co. v. Kentucky*, 566 S.W. 2d 161, 165 (Ky. Ct. App. 1977) ("The doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed."); *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997) ("[A] party's acting according to the express terms of a contract cannot be considered a breach of the duties of good faith and fair dealing.").

Gulfside also maintains on appeal that Churchill Downs violated the Kentucky Consumer Protection Act[3] because its "assertions about the seating post-renovation were untrue and false" and its "stated contractual position was merely a pretext for the shakedown." The district court dismissed this claim, reasoning that Gulfside had failed to allege how it was unfair, false, or misleading for Churchill Downs to claim there was no comparable seating. The district court also

---

[3] The Kentucky Consumer Protection Act creates a private right of action against sellers for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property," Ky. Rev. Stat. § 367.220, as a result of "[u]nfair, false, misleading, or deceptive acts or practices." Ky. Rev. Stat. § 367.170. Like the district court, we assume that Gulfside purchased the PSL for its personal use, and that the PSL constitutes a good or service such that the Kentucky Consumer Protection Act is applicable.

noted that Gulfside had not actually purchased the allegedly artificially-price-inflated seats, and therefore had not suffered an "ascertainable loss of money or property." While Gulfside continues to assert that Churchill Downs is acting in bad faith by claiming there is no ascertainable seating, it does not explain how this contractual position is "unfair, false, [or] misleading." It also has not offered any explanation as to how it has actually suffered an ascertainable loss of money or property when it has not actually purchased the more expensive seats. We therefore agree with the district court that this claim should be dismissed.

In conclusion, the district court did not err in considering the Letter and its attachments. Because Gulfside's arguments are contradicted by the record, the district court also did not err in dismissing its claims. We AFFIRM.